BUTTERFIELD and others, Respondents, vs. HERREN and another, Appellants.

*September 7 — September 29, 1891.*

*Contracts: Sale of lumber: Words "average quality" construed.*

A firm of lumber dealers contracted to sell, for $12 per M, one million feet of strips out of the strips then in pile in their yard, "to be of *average quality* with the six cars heretofore shipped" to the purchasers "as sample of the strips hereby sold." The sample cars contained five different grades of strips. In view of other provisions of the contract (stated in the opinion), and in view of the market price of the different grades as compared with the contract price, it is *held* that the words "to be of average quality," etc., did not mean that the proportionate *quantity* of each grade, as contained in the sample cars, should be delivered under the contract, but merely that the strips should be so assorted or culled that those delivered should equal in quality those contained in the sample cars, without reference to the proportionate quantity of each grade.

APPEAL from the Circuit Court for *Portage* County.

Plaintiffs are partners in business and manufacturers of lumber at Medford, Wis., and defendants are partners and dealers in lumber at Stevens Point, Wis. In March, 1885, the parties entered into a contract in writing whereby plaintiffs sold defendants "one million feet of strips now in their yard at Medford, to be delivered on the cars for shipment to said Stevens Point, out of their strips now in

pile, and to be of average quality with the six cars heretofore shipped to said second party [the defendants] as sample of the strips hereby sold,— 855 thousand feet to be six-inch and 145 thousand feet to be four-inch strips. All strips that will measure 7-8 of an inch or more, and all strips below 7-8 and not less than 3-4 inch in thickness, and suitable to make 1st, 2d, and 3d ceiling, are to be received on this contract." Defendants were to order the full million feet by the 20th of May, 1885, and the title to all not ordered by April 29th was to pass to the defendants. Plaintiffs reserved the right to retain of such lumber three piles of six-inch strips and one pile of four-inch strips. Defendants reserved the right to purchase any strips remaining in the plaintiffs' yards after the written contract should be satisfied (if any remained) upon the terms of their purchase of the 1,000,000 feet. The contract price for the lumber was $12 per thousand feet, but it was stipulated in the contract that "all second-quality fencing which may be received by second party [the defendants] under this contract, in excess of twenty per cent. of the whole amount of strips sold on this contract, shall be paid for at seven dollars per thousand feet." The contract was subsequently modified by the addition thereto of a stipulation that, after reserving the four piles above mentioned, if the amount of strips remaining should fall short of 1,000,000 feet the same should be received in satisfaction of the contract.

The six car-loads of strips referred to in the contract as a sample were graded by defendants into five grades, as follows:

| | |
|---|---:|
| Siding strips | 30,797 feet. |
| Third strips | 15,634 feet. |
| Thin strips | 825 feet. |
| No. 1 fencing | 23,608 feet. |
| No. 2 fencing | 10,059 feet. |
| Total | 80,923 feet. |

There was shipped to defendants, under the contract, 795,960 feet. It seems to be conceded that defendants paid the whole contract price for the lumber, amounting to nearly $9,000, except between $300 and $400 thereof. The defendants graded all of the lumber in the same manner in which the six cars were graded, with the following results:

| | |
|---|---:|
| Siding strips | 110,537 feet. |
| Third strips | 124,841 feet. |
| Thin strips | 17,711 feet. |
| No. 1 fencing | 241,128 feet. |
| No. 2 fencing | 277,804 feet. |
| Short stuff | 23,939 feet. |
| Total | 795,960 feet. |

The last item is understood to be culls, which were not included in the written contract, but were afterwards purchased by the defendants at a stipulated price.

The defendants claim that by the contract the plaintiffs undertook and warranted that the strips delivered thereunder should contain the same relative proportion of each grade as contained in the six car-loads. They interposed a counterclaim for damages for the breach of such warranty. On the trial, the defendants introduced testimony tending to show that the market prices per thousand feet of the above grades, respectively, were, when the strips were delivered, as follows: Siding strips, $29; third strips, $20; thin strips, $18; No. 1 fencing, $12.50; and No. 2 fencing, $7.50. A computation based on the above values will show that, on the theory of the counterclaim, the strips delivered under the contract are worth over $3,000 less than they would have been worth had the proper proportion of the several grades been delivered.

The amount unpaid on the strips at the contract price was conceded, and the court directed a verdict for plaintiffs for that amount, holding that the defendants were not entitled to recover anything under their counterclaim. Judgment

for plaintiffs was entered pursuant to the verdict, from which the defendants appeal.

For the appellants there were briefs by *Raymond & Brennan*, and oral argument by *John H. Brennan*.

For the respondents there was a brief by *Silverthorn, Hurley, Ryan & Jones*, and oral argument by *T. C. Ryan*.

LYON, J. The question which first presents itself for determination, and which, in our opinion, is controlling in the case, is, Does the written contract of the parties for the sale and purchase of the strips therein mentioned contain an undertaking or warranty by the plaintiffs, either express or implied, that the quantity thereof in each grade should be proportionately equal to the percentage of the quantity in such grade contained in the six car-loads mentioned in the contract?

The undertaking of the plaintiffs is that the strips should be " of average quality with the six cars heretofore shipped to said second party [the defendants] as sample of the strips hereby sold,— 855 thousand feet to be six-inch and 145 thousand feet to be four-inch strips." In this stipulation we find no express undertaking that the proportionate *quantity* of each grade, as contained in the six car-loads, should be delivered under the contract. The express undertaking is confined to average *quality*. We look further into the contract for evidence of the intention of the parties, and we find stipulations as to the width of the strips to be delivered under the contract; also that strips of a certain thickness, suitable for three grades of ceiling, should be received under the contract; that culls should be rejected; that plaintiffs might reserve three piles of six-inch strips (stating the dimensions of the piles) and one pile of four-inch strips, all to be of average quality of those sold; and that second quality of fencing which defendant might receive under the contract, in excess of twenty per cent. of

the whole amount of strips sold, should be paid for at the rate of seven dollars per thousand feet.

It will be observed that neither in the above nor in any other provision of the contract is there any reference to "siding, third, or thin strips," which are far more valuable than the fencing grades, nor any language which necessarily suggests the idea that certain proportions in the *quantity* of each grade was required. The contract by its terms makes the width, thickness, and merchantable quality of the strips delivered under it material, but it is silent as to the proportion which the *quantity* of each grade delivered shall bear to the whole.

But there are other considerations bearing upon the question. The defendants' proofs satisfactorily show that the strips belonging to each of the above grades, except No. 2 fencing, were worth more than the contract price for the whole, which was $12 per thousand feet. Only about twelve per cent. of the six car-loads graded second fencing. Yet the defendants agreed to pay the full contract price therefor up to twenty per cent. of the whole amount delivered under the contract, and the parties were careful to stipulate the price for the excess of that grade over twenty per cent. This shows quite conclusively that the defendants did not think they were binding the plaintiffs by the contract to deliver only twelve per cent. of the inferior grade of strips. Twelve per cent. of second fencing would be less than 100,000 feet, yet the plaintiffs delivered, and defendants accepted, under the contract, nearly 280,000 feet of that grade. This, of course, reduced the quantity of the higher grades by just the excess,— or about 180,000 feet. Now, the defendants, after obtaining the benefit of the lower price for the second fencing grade, secured them by the contract, demand a construction of the contract which will give them, as damages, the value of such 180,000 feet of the more valuable grades in excess of the contract price

of $12 per thousand feet. It would be difficult to justify a construction of the contract which will work such a result, especially when it is reasonably clear, from the language employed, that neither party intended it.

There is another consideration tending in the same direction, which is entitled to some weight. If the defendants' construction of the contract is correct, a computation based on their own testimony will show that the strips, if furnished in the proportions contended for, were worth about $20 per thousand feet in the market, while the contract price is but $12. It is scarcely conceivable that experienced business men, as the plaintiffs evidently are, could intentionally enter into so improvident a contract.

It should further be observed that the purchase by the defendants was of strips then in the plaintiffs' yard at Medford, and the contract provided that, if there were more there than the specified 1,000,000 feet, the defendants might purchase the excess on the same terms, and if there were less than 1,000,000 feet in the yard the delivery of the whole (less the four piles reserved by plaintiffs) should be a full compliance with the contract. These facts tend to show, we think, that the plaintiffs intended to sell, and the defendants to purchase, what is termed a " mill run lot " of strips above the grade of culls, without regard to the proportion which the quantity in any one grade bore to that in another grade, or to the whole lot. If the parties intended differently, they certainly failed to use language in their contract evidencing such intention, but, on the contrary, inserted many provisions therein which indicate a different intention.

The only words of the contract upon which even a plausible argument can be framed in support of defendants' construction of the contract are the words, "to be of average quality with the six cars," etc. That construction would require us to add to the above clause the following or its

equivalent: "And the *quantity* of each grade shall bear the same proportion to the whole quantity delivered that the quantity of the same grade in the six cars bears to the aggregate quantity of all the grades contained in such cars." Did the contract indicate less clearly than it does the opposite construction, we should still be of the opinion that the words "average quality" therein should not be construed to mean "proportionate quantity," but only that the strips should be so assorted or culled that those delivered should equal in quality those contained in the six carloads, without any reference to the proportionate quantity of each grade.

For the reasons above suggested we conclude that the theory of the defendants' counterclaim is negatived by the written contract of the parties, and hence that the court did not err in denying them any relief under such counterclaim. That being disposed of, there is no controversy as to the amount the plaintiffs are entitled to recover,— or, at least, the proof is conclusive on the subject. The court directed a verdict for the proper amount.

*By the Court.*— The judgment of the circuit court is affirmed.